## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DEFENDING EDUCATION; COLO-
RADO PARENT ADVOCACY
NETWORK; PROTECT KIDS COLO-
RADO; DO NO HARM; and TRAVIS
MORRELL,

        *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official ca-
pacity as Director of the Colorado Civil
Rights Division; SERGIO RAUDEL COR-
DOVA, GETA ASFAW, MAYUKO
FIEWEGER, DANIEL S. WARD, JADE
ROSE KELLY, and ERIC ARTIS, in their
official capacities as members of the Colo-
rado Civil Rights Commission; and PHILIP
JACOB WEISER, in his official capacity as
the Attorney General of Colorado,

        *Defendants*.

Case No. _____

## COMPLAINT

    Plaintiffs Defending Education, Colorado Parent Advocacy Network, Protect Kids

Colorado, Do No Harm, and Dr. Travis Morrell bring this complaint against Defendants,

various Colorado state officials, under 42 U.S.C. §1983 for violations of the First and Four-

teenth Amendments to the United States Constitution.

## INTRODUCTION

    1.    "If there is any fixed star in our constitutional constellation, it is that no official,

high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other

matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943). The state cannot place its thumb on the scale to favor one side of a contentious public debate. It certainly cannot stifle viewpoints it doesn't like simply because it finds those views offensive or disagreeable.

2.     Colorado is flouting that fundamental constitutional principle. Over fierce opposition from many Coloradans, the State recently adopted a law—House Bill 25-1312—that punishes Coloradans for their speech and compels them to use language endorsing the State's views on highly contested and highly political matters of sex and gender.

3.     H.B. 25-1312 enacts a number of controversial policies designed to promote gender ideology—the notion that sex is not fixed at birth, that people can be "born in the wrong body," and that individuals experiencing gender dysphoria should use potentially irreversible procedures (including hormone treatments and surgery) to change their body to conform to an internal sense of "gender identity."

4.     Relevant here, Section 8 of H.B. 25-1312 amends the State's Anti-Discrimination Act to compel Coloradans to refer to transgender-identifying individuals using their "chosen name" and preferred pronouns.

5.     Specifically, H.B. 25-1312 amends the definition of "gender expression," a protected category under the Colorado Anti-Discrimination Act, to include the use of a "chosen name" and other words by which an individual "chooses to be addressed."

6.     Thus, it is now a "discriminatory practice" under Colorado law to refer to transgender-identifying individuals by their birth name (i.e., not their "chosen name") or to

use biological pronouns (i.e., not their preferred pronouns) in a place of public accommodation.

7.     It is also a "discriminatory practice" under Colorado law to "publish," "display," "circulate," or "mail" any communication that "indicates" that a person's presence at a place of public accommodation is "unwelcome, objectionable, unacceptable, or undesirable" because of "gender expression." Accordingly, H.B. 25-1312's revision to the definition of "gender expression" means that Coloradans who operate in a place of public accommodation are prohibited from publishing or sending materials that refer to a transgender-identifying individual by their birth name (i.e., not their "chosen name") or use their biological pronouns (i.e., not their preferred pronouns).

8.     Coloradans need not use the name that "an individual requests to be known as" only in limited circumstances: when the requested name "contain[s] offensive language" or when the individual is "requesting the name for frivolous purposes." The law contains no exception for using an individual's preferred pronouns.

9.     Defending Education ("DE"), Colorado Parent Advocacy Network ("CPAN"), Protect Kids Colorado ("PKC"), Do No Harm ("DNH"), and Dr. Travis Morrell bring this lawsuit to stop Colorado from abridging the fundamental speech rights of its citizens. All four organizations and Dr. Morrell believe that sex is immutable and fixed at birth, and they oppose the spread of controversial gender ideologies among Colorado's youth. The groups, their leadership, their members, and Dr. Morrell want to speak consistently with that view. They do not want to be forced to affirm—through the use of pronouns, names, or other

language—that a biological man is actually a woman or vice versa. Yet that is precisely what H.B. 25-1312 requires.

10. The challenged provisions of the Colorado Anti-Discrimination Act violate the First Amendment, both facially and as applied, and are impermissibly vague in violation of the Fourteenth Amendment.

11. Plaintiffs bring this action to protect their rights, their members' rights, and the rights of every person in Colorado who does not want to be punished for expressing their sincerely held views about sex and gender. The challenged provisions should be declared unconstitutional, and Defendants should be enjoined from enforcing them.

## PARTIES

12. Plaintiff DE is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include parents, students, and other concerned citizens. DE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of education and the spread of harmful gender ideology. DE has members in Colorado, including Lori Gimelshteyn and Erin Lee, who share DE's opposition to politicized education and gender ideology.

13. Plaintiff CPAN is a statewide, grassroots, 501(c)(4) non-profit organization organized under Colorado law. The organization is based in the State of Colorado. The mission of CPAN is to defend the fundamental right of parents to direct the upbringing, care, and education of their children. CPAN hosts meetings, summits, and other events that are open

to the public and which occur in places of public accommodation. CPAN's Executive Director is Lori Gimelshteyn.

14. Plaintiff PKC is a statewide, grassroots, 501(c)(4) non-profit organization devoted to protecting kids and strengthening families in Colorado. The organization aims to restore the principle that parents have a fundamental right to make decisions about their children's wellbeing and education. PKC hosts meetings and other events that are open to the public and which occur in places of public accommodation. PKC's Executive Director is Erin Lee.

15. Plaintiff DNH is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include healthcare professionals, students, patients, and policymakers. DNH's mission is to ensure that medicine is driven by scientific evidence rather than ideology. To that end, the organization opposes the spread of gender ideology and the use of so-called gender-affirming medical treatments. DNH has members in Colorado who share its opposition to gender ideology and dangerous gender-affirming care. Dr. Travis Morrell is a member of DNH.

16. Dr. Travis Morrell is a licensed physician and a double board-certified dermatologist and dermatopathologist. He also obtained a Master of Public Health degree. Dr. Morrell's medical practice focuses on the diagnosis and treatment of serious skin conditions, including melanoma, carcinoma, autoimmune disease, and cutaneous effects of systemic disorders. Dr. Morrell's practice is located in Grand Junction, Colorado.

17. Defendant Aubrey C. Sullivan is the Director of the Colorado Civil Rights Division. The civil rights division is "a division of [the] state government" responsible for enforcing Colorado's antidiscrimination laws, including H.B. 25-1312. Colo. Rev. Stat. §§24-34-302, 24-34-305. As Director, Sullivan is the "head" of the Civil Rights Division and leads its enforcement functions. *Id.* §§24-34-302, 24-34-306. Sullivan is sued in her official capacity.

18. Defendants Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade Rose Kelly, and Eric Artis are members of the Colorado Civil Rights Commission, with authority to enforce Colorado's antidiscrimination laws, including H.B. 25-1312. *Id.* §§24-34-305, 24-34-306, 24-34-605. The Commissioners are sued in their official capacity.

19. Defendant Philip Jacob Weiser is the Attorney General of Colorado, with authority to enforce Colorado's antidiscrimination laws, including H.B. 25-1312. *Id.* §24-34-306. Weiser is sued in his official capacity.

## JURISDICTION AND VENUE

20. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §1983.

21. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

22. Venue is proper under 28 U.S.C. §1391 because all Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

# FACTUAL ALLEGATIONS

**I.    H.B. 25-1312 compels Coloradans to affirm controversial beliefs about sex and gender with which they disagree.**

23.    States have a strong interest in ensuring that all of their citizens enjoy equal treatment under the law and equal access to places of public accommodation. At the same time, the Constitution "protects the right for minorities and majorities alike to hold certain views" and express those views in the public sphere. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. BOE*, 82 F.4th 664, 671 (9th Cir. 2023). "Often, anti-discrimination laws and the protections of the Constitution work in tandem to protect minority views in the face of dominant public opinions." *Id.* But when the two clash, "antidiscrimination laws, as critically important as they are, must yield to the Constitution." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019).

24.    In other words, even if a State may prohibit "the *act* of discriminating against individuals," it "'is not free to interfere with *speech* for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 572, 579 (1995) (emphasis added).

25.    Colorado was reminded of this lesson just two years ago. In *303 Creative v. Elenis*, the Supreme Court warned Colorado that, even if it can require businesses to "work with all people," it could not use its antidiscrimination laws to compel a website designer to create content endorsing a message with which she disagreed. 600 U.S. 570, 597-602 (2023). A few years before that, though it acknowledged that Colorado could apply antidiscrimination laws

to business owners who "refused to sell *any* goods" to gay customers, the Court chastised the State for trying to coerce a religious baker to "use his artistic skills to make an expressive statement" about the propriety of same-sex marriage. *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 631-33 (2018) (emphasis added).

26.     Unfortunately, Colorado has not taken that lesson to heart. On May 16, Colorado Governor Jared Polis signed into law H.B. 25-1312. Section 8 of that bill, codified at Colo. Rev. Stat. §24-34-301(3.5) & (9), amends Colorado's antidiscrimination laws to prohibit certain speech about sex and gender. *See* Exhibit A.

27.     The Colorado Anti-Discrimination Act already prohibits "discriminatory" or "unfair" practices in employment, housing, public accommodations, and advertising on the basis of various characteristics, including "gender expression." Colo. Rev. Stat. §§24-34-402, 502, 601, & 701. In other words, it was already illegal to deny someone actual "services" or "goods" in a public accommodation because their "dress" or "appearance" does not conform to their biological sex. *Id.* §§24-34-301(9), 601(2)(a); *cf. 303 Creative*, 600 U.S. at 594-95 (parties agree that businesses in Colorado must offer their products on the same terms to all customers).

28.     But H.B. 25-1312 expands the definition of "gender expression" to include conduct and, more importantly, *speech* based on an individual's "chosen name" or "how [they] choos[e] to be addressed." Colo. Rev. Stat. §24-34-301(9). Now, those who operate a public accommodation are liable under the Colorado Anti-Discrimination Act if they refer to

someone without using their chosen name, preferred pronouns, or other gender-affirming terms. *Id.*

29.    H.B. 25-1312 creates only a narrow carveout for this speech compulsion. Speakers need not use the name that "an individual requests to be known as" only when the requested name "contain[s] offensive language" or when the person is "requesting the name for frivolous purposes." *Id.* §24-34-301(3.5). The law contains no exception for using an individual's preferred pronouns. *See id.*

30.    Under H.B. 25-1312, then, someone who operates in a public accommodation commits a discriminatory act when they refer to a transgender-identifying individual using the individual's birth name or biological pronouns instead of their chosen name or preferred pronouns—speech commonly known as "deadnaming" and "misgendering"—because that speech supposedly denies the transgender individual the "full and equal enjoyment" of the place of public accommodation based on their "gender expression." *Id.* §§24-34-301(9), 24-34-601(2)(a).

31.    The Colorado Anti-Discrimination Act also includes an "Unwelcome Provision." Under that provision, it is unlawful for any person to "directly or indirectly … publish" or otherwise distribute "any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable" based on, among other things, "gender expression." *Id.* §24-34-601(2)(a). The Act does not define any of the provision's terms and instead turns on the customer's subjective experience. The term

"unwelcome," for example, commonly means "not wanted." *Merriam-Webster Dictionary* (archived May 18, 2025), perma.cc/9HAD-4MUB; *see also* perma.cc/8CKG-E9K9 ("objectionable" means "offensive"); perma.cc/RHY6-2DL4 ("unacceptable" means "not pleasing or welcome"); perma.cc/9XU4-E22J ("undesirable" means "unwanted").

32.     As amended by H.B. 25-1312, then, the Colorado Anti-Discrimination Act prohibits anyone who operates in a public accommodation from publishing or sending any communication that offends a transgender-identifying person or makes them feel unwelcome because the communication refers to such persons without using their "chosen name" or other terms by which they "choos[e] to be addressed." Colo. Rev. Stat. §24-34-301(9). Such communications constitute a "discriminatory" and "unlawful" practice based on "gender expression." *Id.* §24-34-601(2)(a).

33.     Those who violate the Colorado Anti-Discrimination Act are subject to investigations, lawsuits, and fines.

34.     Those who violate the Colorado Anti-Discrimination Act can be reported to the Colorado Civil Rights Commission. *Id.* §24-304-306(1)(a)(I). The Director "investigat[es]" reports and, upon a determination of probable cause, can issue orders compelling individuals to "participate in compulsory mediation." *Id.* §24-34-306(2)(a), (2)(b)(II). If mediation does not succeed, the Commission can "requir[e]" them "to answer the charges at a formal hearing." *Id.* §24-34-306(4). And if the Commission finds a violation, it can order the speakers to "cease and desist" their speech. *Id.* §24-34-306(9). The Commission can also

order parties "to take affirmative action," *id.* §24-34-605, including "participation in manda-tory educational programs," *303 Creative*, 600 U.S. at 581.

35.     Commission members, the Director, and the Attorney General can each insti-tute investigations of suspected violations of the law on their own, without first receiving a report. Colo. Rev. Stat. §24-304-306(1)(b).

36.     The Colorado Anti-Discrimination Act also threatens private lawsuits and fi-nancial penalties. Those who violate the law can be sued by an "aggrieved" party and, upon a finding of liability, be forced to pay substantial fines and subjected to injunctive relief. *See id.* §24-34-602(1)(a).

## II.     H.B. 25-1312 was designed to punish disfavored speech.

37.     The purpose of H.B. 25-1312 is clear. The law punishes those who refuse to speak using chosen names and pronouns, and it does so in order to suppress traditional beliefs about sex and gender. In other words, the law openly discriminates based on view-point.

38.     H.B. 25-1312's viewpoint discrimination is apparent from the text itself. On its face, the law punishes the use of any name *except* an individual's "chosen name." Colo. Rev. Stat. §24-34-301(9). And it punishes the use of any manner of address—e.g., pronouns—*other* than "how the individual chooses to be addressed." *Id.* But "refus[ing] to address" an individual with their chosen name or pronouns "advance[s] a viewpoint on gender identity." *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). This viewpoint affirms that "sex is fixed in each person from the moment of conception, and that it cannot be changed,

regardless of an individual's feelings or desires." *Id.* Even if H.B. 25-1312 prohibited only offensive refusals to use someone's chosen name or pronouns, "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017); *see Iancu v. Brunetti*, 588 U.S. 388, 394 (2019) (same).

39.  H.B. 25-1312's sponsors confirmed that the law's speech prohibitions are designed to push those with traditional views about sex and gender out of the public conversation. State Representative Lorena García, the law's prime sponsor, described those who refer to others using biologically accurate pronouns and birth names as "bull[ies]." Marissa Ventrelli, *Colorado Democrats Seek to Penalize 'Misgendering' and Deadnaming'*, Denver Gazette (Apr. 3, 2025), perma.cc/9U5U-TJ4X. Another sponsor, asked why parental rights groups who oppose gender ideology were not consulted during the law's drafting, called such organizations "hate groups," compared them to the "KKK," and explained that she had no interest in hearing their "opinion." Tyler O'Neill, *'Crossed the Rubicon': Colorado House Passes Bill Treating as Child Abuse Dissent From Transgender Orthodoxy*, Daily Signal (Apr. 7, 2025), perma.cc/Z8VY-8A8G.

40.  The law's proponents likewise welcomed H.B. 25-1312 precisely because it places a thumb on the scale in the public debate surrounding gender ideology and "gender-affirming care."  In their eyes, traditional views about sex and gender don't deserve legal protection because "calling someone by the wrong name or pronoun on purpose" isn't "free speech"; it's "spite" and "discrimination." Melissa Goset, *Colorado Passes Groundbreaking Trans Rights Legislation*, GoMag (Apr. 4, 2025), perma.cc/XZQ9-9J35.

41.     As Representative García says, H.B. 25-1312 sends a "message … that we are not going to tolerate" dissenting speech on sex and gender. Jacob Factor, *'Kelly Loving Act':* *Colorado Lawmakers Push for More Transgender Protections*, FOX31 (Apr. 10, 2025), bit.ly/4k4dVS1.

## III.  H.B. 25-1312 injures Plaintiffs and their members.

### A.     Defending Education, CPAN, and PKC.

42.     ***Defending Education***. DE is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include parents, students, and others concerned about the state of education in America. The organization's mission is to prevent the politicization of both K-12 and higher education, including government attempts to usurp parents' rights and to silence students who express dissenting views. DE furthers its mission through network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful school policies to DE's members and other parents; advocacy; and, if necessary, litigation.

43.     DE strongly opposes the spread of harmful gender ideology and so-called gender-affirming care, and the organization strives to protect the right of its members to speak freely about these topics. In line with that mission, DE regularly litigates on behalf of its members to protect their First Amendment right to refer to individuals using biologically accurate pronouns and/or birth names. DE also publishes informational resources about the scope of, and threats to, constitutional speech rights, and it advises parents and students on how to navigate school speech restrictions.

44. DE has members in Colorado who share the organization's opposition to the politicization of America's schools and the spread of harmful gender ideology.

45. DE's members include Lori Gimelshteyn, CPAN's Executive Director, and Erin Lee, PKC's Executive Director. DE's members in Colorado are injured by H.B. 25-1312.

46. ***CPAN and Lori Gimelshteyn***. Lori Gimelshteyn is the Executive Director of Colorado Parent Advocacy Network ("CPAN"). In her role as Executive Director, she runs the organization on a day-to-day basis and is its lead spokesperson.

47. CPAN is a statewide, grassroots, 501(c)(4) non-profit organization organized under Colorado law. The organization is based in the State of Colorado. The mission of CPAN is to defend the fundamental right of parents to direct the upbringing, care, and education of their children. CPAN is committed to restoring an educational environment in Colorado that is academically rigorous, non-ideological, safe, and transparent.

48. In furtherance of this mission, CPAN advocates for educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives. CPAN furthers this mission through network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and statewide school policies; public education efforts including summits and informational resources; direct support for families navigating complex systems; strategic communications and media outreach; advocacy; and, if necessary, litigation.

49.     Much of CPAN's programming and advocacy focuses on K-12 education. The organization encourages schools to prioritize educational quality over politics, opposes the teaching of gender ideology, and defends the free speech rights of students, parents, and educators. CPAN regularly offers informational resources and hosts public events about the state of education in Colorado. *E.g.*, *School Safety Summit*, bit.ly/4ddPLCj; *Whose Children Are They?*, bit.ly/3GPKXHm; *Protecting Taxpayers & Prioritizing Academic Achievement In Our Schools*, bit.ly/4mbybTF; *Colorado's National School Choice Week*, bit.ly/3EQR7Xc.

50.     CPAN supports traditional views and opinions on matters of sex and gender identity. In particular, CPAN and Ms. Gimelshteyn believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. CPAN and its leadership want to exercise their fundamental constitutional right to speak in a manner that reflects those views.

51.     In line with their belief that sex is determined at birth and immutable, when CPAN or its leaders (including Ms. Gimelshteyn) speak about individuals, they want to refer to those individuals using biologically accurate pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

52.     When CPAN and Ms. Gimelshteyn use birth names and biologically accurate pronouns, they are not doing so to be malicious or hurtful. They do so because this expression reflects their deeply held beliefs that sex is fixed in each person from the moment of conception and cannot be changed. If they were to refer to a biological male as a "she"

instead of a "he," they would be lying to themselves and to others. They would be communicating an idea and belief that they firmly disagree with.

53.     The use of birth names and biologically accurate pronouns is also critical to CPAN's mission. CPAN and Ms. Gimelshteyn vehemently oppose government attempts to promote harmful practices concerning gender identity, such as allowing biological males to compete in women's sports. Using birth names and biological pronouns sends a powerful message and reminder that a person was born a male or a female and cannot change their sex based on personal preference. Being compelled to use an individual's preferred pronouns or names would prevent CPAN and Ms. Gimelshteyn from expressing their core beliefs— and, in effect, surrender the debate before it begins.

54.     CPAN hosts meetings, summits, and other events in places of public accommodation. These events are open to the public, including parents and other interested individuals. CPAN is therefore subject to Colorado laws governing places of public accommodation. *See* Colo. Rev. Stat §24-34-601 (prohibiting "discrimination in places of public accommodation"); *Creek Red Nation v. Jeffco Midget Football Ass'n*, 175 F. Supp. 3d 1290, 1298 (D. Colo. 2016) ("[P]ublic accommodation" includes "organizations that conduct activities in facilities … that are open to the public."). For example, in April 2024, CPAN leased space in the Inverness Hilton, a hotel in Englewood Colorado, to host a "Summit on Safeguarding Children from Gender-Affirming Care." CPAN hosted a second summit on the same topic at the same hotel in April 2025. Both summits were open to the public and widely advertised.

55.     CPAN plans to host additional public events in the future and has agreements in place to lease space in places of public accommodation for those events.

56.     At its public events, CPAN, its officers (including Ms. Gimelshteyn), and other attendees frequently discuss specific individuals, including transgender individuals. When they do so, they have used biologically accurate pronouns and birth names rather than "preferred pronouns" and "chosen names." For example, they have discussed Representative Brian Titone and how the person identifies as a woman and goes by the name "Brianna," and Kevin Smotherman (who ran for the State Senate) and how the person identifies as a woman and goes by the name "Vivian." In line with their beliefs about sex and gender, when CPAN, its officers, and attendees discuss specific individuals, they want to refer to those individuals using their birth names and biologically accurate pronouns, rather than their chosen names, preferred pronouns, or other terms that correspond with their self-professed gender identity or gender expression. As another example, to highlight the prevalence of gender ideology in American media, they will call out biologically male celebrities and say things like, "Dylan Mulvaney is a man pretending to be a woman. 'She' is actually a 'he' and does not know the experience of American girls."

57.     Transgender-identifying individuals have attended CPAN's public events in the past, and CPAN anticipates that transgender-identifying individuals will attend their events in the future. For example, at CPAN's last event, a transgender-identifying individual showed up at the event and told Ms. Gimelshteyn he had come because he was concerned that they were not going to represent the perspective of the transgender community at their event.

Ms. Gimelshteyn told him that their event was designed to highlight the harms of gender ideology, not to promote the other side's views. At the same event, two different parents each brought one of their children. One child identifies as transgender and the other identifies as nonbinary. CPAN also had protestors outside of the event, many of whom identify as transgender.

58.     At their events, when CPAN, its officers, or other attendees have referred to transgender individuals, they have used biological pronouns and other biologically accurate terms, regardless of whether those pronouns or terms conform to the individuals' preferred forms of address, gender identity, or gender expression. In the future, they want to continue discussing and referring to transgender-identifying attendees using biologically accurate terms and birth names.

59.     CPAN and Ms. Gimelshteyn also want to publish materials—for example, flyers advertising CPAN events, videos and presentations from the events, social media posts, educational resources for parents, and other materials distributed at their events—that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression. For example, in March 2025, to raise awareness about the danger that "gender-affirming care" poses to children, CPAN published a post on X about a Colorado teacher who harbored a 17-year-old transgender-identifying child without the parent's consent. Though the child, who goes by "Onyx," identified as a boy, CPAN's post referred to the child as "a teen girl."

60. CPAN regularly publishes materials that comment on state and local policy proposals, highlight developing news stories in the education and gender space, advise parents on how to navigate the Colorado school system, and inform parents and other Coloradans about the prevalence of gender ideology in Colorado schools and the danger of "gender-affirming care." These published materials include petitions supporting or opposing legislation, social media posts, informative videos, documentaries, investigative reports, opinion pieces in widely circulated newspapers and online publications, gender issue guidelines, and other resources. In April 2025, for example, CPAN published an infographic informing Coloradans about the threat to parental rights and free speech posed by Colorado House Bill 25-1312.

61. CPAN's published materials often refer to specific individuals, including transgender individuals. For example, in March 2024, CPAN published a post on X responding to a video featuring Dylan Mulvaney, a transgender activist. Though Mulvaney identifies as a woman, the tweet referred to Mulvaney using the person's biological sex, stating "That is a man ridiculing girls."

62. In line with their belief that sex is immutable and determined at birth, CPAN and Ms. Gimelshteyn want to publish materials that refer to individuals using biologically accurate pronouns and other gendered terms, even if those biologically accurate pronouns differ from an individual's preferred pronouns or conflict with an individual's self-professed gender identity or gender expression. CPAN and Ms. Gimelshteyn also want to refer to

individuals in published materials using birth names rather than names chosen by individuals to match their self-professed gender identity or gender expression.

63. However, Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for CPAN and their leadership to effectively exercise their constitutionally protected right to speak in a manner that reflects their sincere belief that sex is immutable and fixed at birth.

64. Because of the public nature of CPAN's and Ms. Gimelshteyn's expression, they are well-known among the transgender activist community in Colorado. They have become a frequent target of harassment and intimidation by individuals and groups who oppose their mission. They have received aggressive and threatening emails and messages from individuals because of their speech. Ms. Gimelshteyn has received death threats because of her work. After she testified against H.B. 25-1312, an individual spat in her hair. She has been called a "Nazi" and a "white supremacist." She once received a thank-you card from the Satanic Temple, thanking her for "motivating a generous donation" that had been made in her name. Protestors regularly attend CPAN's events. Ms. Gimelshteyn has also been sued in her personal capacity over her work combatting gender ideology. *See Mary Elizabeth Childs v. Lori Gimelshteyn and Erin Lee*, No. 2024SA63 (Colo. S. Ct. filed Feb. 28, 2024). Given her past experience, she has no doubt that there are individuals who will want to report CPAN or her or sue them because of their speech.

65. Because H.B. 25-1312 threatens to punish deadnaming and misgendering, CPAN and its leadership, including Ms. Gimelshteyn, must stop referring to individuals

using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression" at their public events and in their published materials. They fear that, if they continue to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, they will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties. Ms. Gimelshteyn also fears that she will be sued personally, e.g., for refusing to "addres[s]" an individual using their "chosen name" or other preferred terms. *Id.* §24-34-301(3.5), (9); *see* §24-34-602(1)(a) ("*Any person*" who commits a discriminatory act may be sued (emphasis added)).

66.     H.B. 25-1312's punishments for disfavored speech also means that CPAN and Ms. Gimelshteyn must refrain from "publish[ing]" materials in connection with their public events that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. *Id.* §24-34-601(2)(a).

67.     Because H.B. 25-1312 renders CPAN and Ms. Gimelshteyn unable to speak candidly about biological sex or publish materials that contain such speech, their ability to inform parents about gender ideology in Colorado schools is greatly diminished. Likewise, their ability to organize support for or opposition to political candidates, ballot measures, legislation, school board policies, or other measures is compromised. Because of H.B. 25-1312, CPAN and Ms. Gimelshteyn are no longer allowed to use their preferred language at their public events or in their publications. Nor can they discuss specific news stories involving transgender-identifying individuals.

68.     As Executive Director of CPAN, Ms. Gimelshteyn is in constant communication with parents and other Colorado citizens concerned about the spread of gender ideology and the state of Colorado schools. It is her experience that these parents and citizens will be less likely to support CPAN if they believe the organization may face legal penalties, including fines, for so-called discriminatory speech. Also in her experience, venues will be less willing to host their public events if CPAN is branded a "discriminatory" organization.

69.     CPAN and Ms. Gimelshteyn do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. They want to continue to speak, publish materials, and host events consistent with their belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet they are unable to effectively exercise their speech rights because of H.B. 25-1312's prohibitions and penalties.

70.     ***PKC and Erin Lee.*** Erin Lee is the Executive Director of Protect Kids Colorado ("PKC"). In her role as Executive Director, she runs the organization on a day-to-day basis and is its lead spokesperson.

71.     PKC is a statewide, grassroots, 501(c)(4) non-profit organization devoted to protecting kids and strengthening families in Colorado. The organization aims to restore the principle that parents have a fundamental right to make decisions about their children's well-being and education. It hopes to raise awareness about the prevalence of false gender ideologies and the dangers of so-called gender-affirming treatments. PKC furthers this

mission through coalition-building; advocacy; petitions and ballot initiatives; engagement on local, state, and national policies; educational campaigns; and, if necessary, litigation.

72.     Much of PKC's programming focuses on K-12 education and school transparency. The organization raises awareness about the prevalence of controversial gender ideology in Colorado's public schools, warns parents of the need to closely monitor their children's education, and hosts public events on those same topics. *E.g.*, Emily Washburn, *'Art Club' Documentary — One Family's Escape from Gender Ideology, and the Bigger Trend Sweeping the Nation*, The Daily Citizen (Feb. 6, 2024), perma.cc/RZ94-YRPY.

73.     PKC supports traditional views and opinions on matters of sex and gender identity. In particular, PKC and Ms. Lee believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. PKC and its leadership want to exercise their fundamental constitutional right to speak in a manner that reflects those views.

74.     In line with their belief that sex is determined at birth and immutable, when PKC or its leaders (including Ms. Lee) speak about individuals, they want to refer to those individuals using biologically accurate pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

75.     When PKC and Ms. Lee use birth names and biologically accurate pronouns, they are not doing so to be malicious or hurtful. They do so because this expression reflects their deeply held beliefs that sex is fixed in each person from the moment of conception and cannot be changed. If they were to refer to a biological male as a "she" instead of a "he,"

they would be lying to themselves and to others. They would be communicating an idea and belief that they firmly disagree with.

76.    The use of birth names and biologically accurate pronouns is also critical to PKC's mission. PKC and Ms. Lee vehemently oppose government attempts to promote harmful practices concerning gender identity, such as allowing biological males to compete in women's sports. Using birth names and biological pronouns sends a powerful message and reminder that a person was born a male or a female and cannot change their sex based on personal preference. If they were forced to identify an individual by his or her "preferred" pronoun and names, then they have already lost the debate.

77.    PKC hosts meetings and other events in places of public accommodation. These meetings are open to parents and other interested members of the public. PKC is therefore subject to Colorado laws governing places of public accommodation. *See* Colo. Rev. Stat §24-34-601; *Creek Red Nation*, 175 F. Supp. 3d at 1298. For example, in July and August 2024, PKC leased space in Denver-area restaurants to host signature-gathering events in support of its ballot initiatives. PKC publicized these events on social media.

78.    PKC plans to host additional public events in the future and is actively seeking to lease space in places of public accommodation for those events.

79.    At its public events, PKC, its officers (including Ms. Lee), and other attendees frequently discuss specific individuals, including transgender individuals. When they do so, they have used biologically accurate pronouns and birth names, rather than "preferred pronouns" and "chosen names." In line with their beliefs about sex and gender, when PKC and

its officers discuss specific individuals, they want to refer to those individuals using their birth names and biologically accurate pronouns, rather than their chosen names, preferred pronouns, or other terms that correspond with their self-professed gender identity or gender expression. For example, a powerful way for them to oppose allowing biological males to compete in women's sports is to speak the truth that the person was born a male. They often say things like, "That swim meet was deeply unfair. It was won by a biological male who was born William Thomas but now calls himself Lia Thomas. He should not have been allowed to compete in an event for female athletes."

80.    Transgender-identifying individuals have attended PKC's public events in the past, and PKC and Ms. Lee anticipate that transgender-identifying individuals will attend their events in the future. For example, a few weeks ago, PKC sponsored an event at a recreation center that was open to the public. An individual who Ms. Lee knows to identify as transgender came to the event.

81.    At their events, when PKC, its officers, or other attendees have referred to transgender individuals, they have used biological pronouns and other biologically accurate terms, regardless of whether those pronouns or terms conform to the individuals' preferred forms of address, gender identity, or gender expression. In the future, they want to continue discussing and referring to transgender-identifying attendees using biologically accurate terms and birth names.

82.    PKC and Ms. Lee also want to publish materials—for example, flyers advertising PKC events, videos of their events, educational resources for parents, social media posts,

and other materials distributed at their events—that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression. For example, PKC and Ms. Lee have in the past opposed the positions of Colorado State Representative "Brianna Titone." Titone identifies as a woman and goes by the name "Brianna." But in Ms. Lee's capacity as Executive Director of PKC, she refers to Representative Titone using biological sex and the birth name, Brian Titone. PKC and Ms. Lee want to be able to publish materials that say things like, "Tell Brian Titone to stop his attacks on Colorado families."

83. PKC and Ms. Lee regularly publish materials that comment on state and local policy proposals, highlight developing news stories involving gender ideology and children, advise parents on how to navigate the Colorado school system, and inform parents and other Coloradans about the prevalence of gender ideology in Colorado schools and the danger of "gender-affirming care." These published materials include petitions, social media posts, informative videos, gender issue guidelines, opinion pieces in widely circulated newspapers and online publications, and other resources. For example, in April 2025, PKC published a guide on reasons to oppose Colorado House Bill 25-1312, emphasizing the threat to free speech posed by the bill's chosen name provisions.

84. PKC's and Ms. Lee's published materials often refer to specific individuals, including transgender individuals. For example, in March 2025, PKC posted a video on Instagram of a transgender-identifying student athlete in Oregon. Although the athlete

identifies as a girl and uses the chosen name "Ada," PKC's video referred to the person with the birth name, "Aayden," and identified the person as a "male" and not a "girl."

85.     In line with their belief that sex is immutable and determined at birth, PKC and Ms. Lee want to publish materials that refer to individuals using biologically accurate pronouns and other gendered terms, even if those biologically accurate pronouns differ from an individual's preferred pronouns or conflict with an individual's self-professed gender identity or gender expression. PKC and Ms. Lee also want to refer to individuals in published materials using individuals' birth names rather than names chosen by individuals to match their self-professed gender identity or gender expression.

86.     However, Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for PKC, their leadership, their supporters, and their volunteers to effectively exercise their constitutionally protected right to speak in a manner that reflects their sincere belief that sex is immutable and fixed at birth.

87.     Because of the public nature of PKC's and Ms. Lee's expression, they are well-known among the transgender activist community in Colorado. They have received aggressive and threatening emails and messages from individuals because of their speech. Ms. Lee has received death threats because of her activities (as recently as about six weeks ago), and she has reported these threats to the FBI and to the sheriff's office. She has been called a "bigot," a "Nazi," a "transphobe," an "anti-trans zealot," a "terrorist," a "murderer," a "child abuser," and a "Christian nationalist." She has also been sued in her personal capacity over her work combatting gender ideology. *See Mary Elizabeth Childs v. Lori Gimelshteyn and Erin*

*Lee*, No. 2024SA63 (Colo. S. Ct. filed Feb. 28, 2024). Given her past experience, she has no doubt that there are individuals who will want to report her and PKC or sue her and PKC because of their speech.

88.     Because H.B. 25-1312 threatens to punish deadnaming and misgendering, PKC and its leadership, including Ms. Lee, must stop referring to individuals using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression" at their public events and in their published materials. They fear that, if they engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, they will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties. Ms. Lee also fears that she will be sued personally for refusing to "address" an individual using their "chosen name" or other preferred terms.

89.     H.B. 25-1312's punishments for disfavored speech also means that PKC and Ms. Lee must refrain from "publish[ing]" materials in connection with their public events that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. Colo. Rev. Stat. §24-34-601(2)(a).

90.     Because H.B. 25-1312 renders PKC unable to speak candidly about biological sex or publish materials that contain such speech, their ability to inform parents about dangerous gender ideology in Colorado schools is greatly diminished. Likewise, their ability to organize support for or opposition to political candidates, ballot measures, legislation, school

board policies, or other measures is compromised. Because of H.B. 25-1312, PKC and Ms. Lee are no longer allowed to use their preferred language at their public events or in their publications. Nor can they oppose specific political figures with their preferred language, such as Representative Titone, as explained above.

91.     As Executive Director of PKC, Ms. Lee is in constant communication with parents and other Colorado citizens concerned about the spread of gender ideology and the state of Colorado schools. It is her experience that these parents and citizens will be less likely to share information with PKC, volunteer with PKC, or otherwise support its mission if they believe the organization or its supporters may face legal penalties, including fines, for so-called discriminatory speech. Also in Ms. Lee's experience, venues will be less willing to host their public events if PKC is branded a "discriminatory" organization.

92.     PKC and Ms. Lee do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. They want to continue to speak, publish materials, and host events consistent with their belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet they are unable to effectively exercise their speech rights because of H.B. 25-1312's prohibitions and penalties.

**B.    Do No Harm and Dr. Travis Morrell.**

93.     ***Do No Harm.*** DNH is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include healthcare professionals, students, patients, and policymakers. DNH's mission is to ensure that medicine is driven by scientific evidence

rather than politics. To that end, DNH seeks to highlight and counteract divisive trends in medicine, such as "Diversity, Equity, and Inclusion" practices and youth-focused gender ideology. DNH opposes the use of chosen names, preferred pronouns, and so-called gender-affirming medical treatments. DNH furthers its mission through network- and coalition-building; educational resources to raise awareness about divisive trends in the medical field; engagement on local, state, and national policies; advocacy; and, if necessary, litigation.

94. DNH works to protect the rights of its members to speak freely on controversial topics in the medical profession, including gender ideology and gender-affirming care. In line with that mission, DNH litigates to protect its members' First Amendment rights and educates its members about threats to free expression in the medical field.

95. DNH has members in Colorado who share its opposition to gender ideology and dangerous gender-affirming care, including Dr. Travis Morrell. DNH's members in Colorado, including Dr. Morrell, are injured by H.B. 25-1312.

96. ***Dr. Travis Morrell***. Dr. Morrell holds scientific, objective, and reproducible views on matters of sex and gender identity. In particular, he believes that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. He wants to exercise his fundamental constitutional right to speak in a manner that reflects those views.

97. Dr. Morrell has treated transgender-identifying patients in his medical practice in the past, and he anticipates treating transgender-identifying patients in the future. When he has addressed these patients or discussed these patients with his colleagues, he has used

biologically accurate pronouns and birth names. He does not address or refer to patients using "chosen names" connected to their "gender expression" or preferred pronouns that conflict with the patient's biological sex. In a patient's records, he refers to all patients using biologically accurate terms.

98.    Addressing and referring to patients using accurate terms is important to his work as a physician. Determining the proper course of treatment or advising patients on their treatment's risks, for example, might depend on a patient's biological sex, so it is important that he be able to clearly communicate (both to patients and to other medical professionals) whether a patient is male or female.

99.    In addition, as a medical doctor, Dr. Morrell is trained to treat patients holistically. Dr. Morrell has difficult discussions with patients about psychiatric disorders, habits and behaviors that may impact them both dermatologically and overall, such as alcohol abuse, smoking, anxiety, body dysmorphia, self-harm, and, relevant here, gender dysphoria. In these cases, it is vital that he be able to address the root cause. The medical treatment of gender dysphoria with cross-sex hormones and surgery may impact many aspects of the patient's health, even in areas that might appear unrelated. Surgical procedures, particularly in areas involved with sex-reassignment, may cause extensive scarring. Cross-sex hormones affect the entire body, including the skin, where testosterone can cause severe cystic acne in some cases. It is of tremendous importance that he be permitted to provide accurate information regarding the risks associated with these interventions. Affirmation of the patient's

subjective experience under these circumstances is potentially deleterious to their health, which should, at all times, be the primary concern.

100. Dr. Morrell also believes that affirming an individual's non-biological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria. "Social transition," involving "chosen names" and "pronouns," has been found to contribute to increased medicalization and its harmful effects. Therefore, as a medical professional with an obligation not to harm his patients, he believes it would be wrong to address a male patient using feminine pronouns or his "chosen name" or address a woman using masculine pronouns or her "chosen name." If he were to do so, he would be affirming a lie and harming his patients.

101. In line with his beliefs, when transgender patients are in his office, Dr. Morrell does not want to be forced to use "chosen names" or "preferred pronouns" when addressing or referring to them. When he discusses patients with other medical professionals or employees in his office (such as other doctors, schedulers, or medical assistants), he wants to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, he might say, "Can you please perform a urine pregnancy test for Sarah"; "Let's send his penile biopsy specimen to the lab"; or "What were the results of her pregnancy test?" His patients will inevitably hear these statements—both because he will

make them in front of the patient and because his workspace is immediately outside his patient rooms so that sound carries throughout the space.

102.   Moreover, because he believes that gender ideology is so harmful, Dr. Morrell wants to be able to address individuals (both orally and in written communications) directly by their birth name and not a "chosen name." Calling a biological male by a female's name would further indulge the person's delusions that he or she can change or has changed his or her gender.

103.   When Dr. Morrell refers to patients in medical records, he wants to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, he might say, "Her rash is most consistent with subacute cutaneous lupus erythematosus," or "Jennifer has been taking oral contraceptives for over one month." These medical notes would be available to the patient on their online portal. Patients can also receive a printed copy of these notes by asking the front desk.

104.   Dr. Morrell also wants to publish materials that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

105.   Dr. Morrell regularly speaks and writes on the issues of sex and gender as they relate to the medical profession. In those speaking engagements and publications, he opposes gender ideology (including the use of chosen names and preferred pronouns) and raises awareness about the dangers of gender-affirming care. *E.g.*, Travis Morrell, *Medical*

*Schools Have Embraced Radicalism*, Washington Examiner (Sept. 26, 2024), perma.cc/79SM-SKVS; *Rocky Mountain Summit on Safeguarding Children from Gender-Affirming Care*, CPAN (archived May 12, 2025), perma.cc/WQM6-PQXN. Dr. Morrell is also the founder and chair of Colorado Principled Physicians, a group dedicated to protecting free speech in the medical profession and opposing gender-affirming care.

106.   Dr. Morrell's speaking engagements are held in places of public accommodation, including hotel event spaces and restaurants. Transgender individuals have attended his events, and he anticipates that they will attend them in the future. At his speaking events, he has referred to transgender individuals by their biological pronouns (instead of their "preferred pronouns") and their birth names (instead of their "chosen names"). He wants to continue to speak in this manner in the future. Speaking the truth is critical to his work.

107.   Dr. Morrell is also active on social media, where—consistent with his belief that sex is immutable—he regularly publishes content that opposes gender ideology and refers to transgender-identifying individuals using biological pronouns and birth names rather than preferred pronouns or chosen names. For example, he has opposed the policies of Colorado State Representative "Brianne Titone." Titone identifies as a woman and goes by the name "Brianne," but Dr. Morrell's social media posts refer to Titone using biological sex and birth name, Brian. Dr. Morrell wants to continue to publish materials that say things like, "Oppose Brian Titone because his policies hurt Colorado's children," or "Even though Brian's post says he can 'get some clear liquid to seep out of the nips,' that is not breastmilk and he cannot breastfeed."

108. Dr. Morrell does not use birth names or biologically accurate pronouns to be mean or hurtful. He does so because that speech reflects his belief that sex is fixed in each person from the moment of conception and cannot be changed, and because he believes that affirming a patient's non-biological gender identity or gender expression would harm rather than help the patient.

109. Because of the public nature of his expression, Dr. Morrell is known among the transgender activist community in Colorado. He regularly receives direct messages, reply posts, and emails challenging or disagreeing with the views that he has expressed. He has received aggressive and threatening messages from individuals because of his speech. At his last public speaking event in April, about 40-60 people protested his event. After the protest was announced, the conference center required him to hire two armed deputies for the event. He has been called a "Nazi" and had his speech interrupted. Activists recently organized a successful campaign to pressure the Accreditation Council for Continuing Medical Education (ACCME) to cancel the Continuing Medical Education (CME) credit that was to be made available for one of his speeches. Last year, a number of people whom he has never treated "review bombed" him on Google Reviews by posting fake reviews and giving him one star. One individual posted that he was "Not a safe physician for lgbt patients." Given his extensive history of harassment, he has no doubt that there are individuals who will want to report him or sue him because of his speech.

110. Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for him to effectively exercise his constitutionally protected right to speak in a manner that reflects his beliefs.

111. Because H.B. 25-1312 threatens to punish deadnaming and misgendering, Dr. Morrell must stop addressing or referring to individuals in his medical practice using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression." He fears that, if he continues to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, he will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties.

112. H.B. 25-1312's punishments for disfavored speech also means that he must refrain from "publish[ing]" materials that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. Colo. Rev. Stat. §24-34-601(2)(a).

113. Because H.B. 25-1312 renders him unable to speak candidly about biological sex in his practice or publish materials and communications that contain such speech, Dr. Morrell's ability to treat patients is compromised. Likewise, his ability to give speeches and publish content promoting his view that sex is immutable, and that medical professionals should address patients using accurate terms, is greatly diminished. As is his ability to oppose legislation and politicians who promote harmful gender ideology. Because of H.B. 25-1312,

Dr. Morrell is no longer allowed to use his preferred language in his practice or his publications.

114.   Dr. Morrell does not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. Dr. Morrell wants to continue to speak, publish materials, send communications, and treat patients consistent with his belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet he is unable to effectively exercise his speech rights because of Colorado law.

### COUNT I
### Violation of the First Amendment
### (Colo. Rev. Stat. §24-34-301(3.5) & (9) – The "Chosen Name" and "Gender Expression" Provisions)

115.   Plaintiffs repeat and reallege each of the prior allegations in this complaint.

116.   H.B. 25-1312's "chosen name" and "gender expression" definitions violate the First Amendment to the United States Constitution, both facially and as applied.

117.   The definition of "gender expression" prohibits any act of discrimination based on "chosen name" and "how the individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). "Chosen name" is further defined to include any "name that an individual requests to be known as in connection to" any one of a long list of protected characteristics, including "gender identity" and "gender expression." *Id.* §24-34-301(3.5). The only exceptions are for names that "contain offensive language" or are chosen "for frivolous purposes." *Id.*

118. ***Compelled Speech***. The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. AFSCME*, 585 U.S. 878, 892 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N. Carolina*, 487 U.S. 781, 790-91 (1988). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 585 U.S. at 892.

119. Here, the "gender expression" and "chosen name" provisions unconstitutionally compel speech because they require speakers to use "chosen name[s]" and preferred pronouns instead of using birth names and biological pronouns. Colo. Rev. Stat. §§24-34-301(3.5), (9), 24-34-601(2)(a).

120. The Supreme Court's decision in *303 Creative* requires the conclusion that H.B. 25-1312 unconstitutionally compels speech. There, Colorado argued that its public accommodation antidiscrimination laws required a wedding website designer to create websites for same-sex marriages even though the designer firmly believed that "marriage should be reserved to unions between one man and one woman." 600 U.S. at 580-83. But that, said the Court, "would not respect the First Amendment." *Id.* at 592. Though the designer's business

was a public accommodation, and public accommodation laws play "a vital role" in ensuring "'equal *access* to public establishments,'" the designer's custom website creations were "pure speech," and Colorado could not apply its public accommodation laws to coerce "'expressive activity'" out of the designer. *Id.* at 587-92 (emphasis added).

121.    All the more so here. If anything is "pure speech," it is the actual words Coloradans use to address one another, especially when those words express a view about something as fundamental as sex and gender. *See Meriwether*, 992 F.3d at 508 ("Pronouns can and do convey a powerful message implicating a sensitive topic of public concern.") Colorado seeks to regulate that speech by compelling groups like CPAN and PKC and individuals like Ms. Gimelshteyn, Ms. Lee, and Dr. Morrell to speak using state-approved language.

122.    That H.B. 25-1312 does not literally require Coloradans to speak is of no consequence. Even if Plaintiffs and their members could avoid the law's penalties by holding their tongues, compelled silence *is* compelled speech. *Riley*, 487 U.S. at 796-97. In any event, using pronouns and names is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715). It would be "impossible" for Plaintiffs or their members to not "use any pronouns" or any names when discussing an individual. *Meriwether*, 992 F.3d at 517. So H.B. 25-1312 forces them to "carr[y]" the "government['s] message" about sex and gender. *Doe 1*, 367 F. Supp. 3d at 1326.

123.    ***Viewpoint- and Content-Based Regulations of Speech***. "'If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the

expression of an idea simply because society finds the idea itself offensive or disagreeable.'" *Simon & Schuster v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 118 (1991). Speech restrictions "based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "Content-based regulations" are likewise "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "[A]ny restriction based on the content of the speech must satisfy strict scrutiny." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

124. H.B. 25-1312 punishes speech based on its content and viewpoint. Specifically, the "chosen name" and "gender expression" provisions punish individuals for speaking about transgender-identifying individuals using *birth* names and *biological* pronouns, but not if they use an individual's "chosen name" or other terms by which they "choos[e] to be addressed." Colo. Rev. Stat. §24-34-301(9).

125. That is a classic viewpoint-based speech regulation. *See, e.g.*, *Meriwether*, 992 F.3d at 506-07 (invalidating a state university's policy requiring professors to use preferred pronouns because "the state cannot wield its authority to categorically silence dissenting viewpoints"). And because the law regulates based on viewpoint, it is necessarily unconstitutional. *See 303 Creative*, 600 U.S. at 589 (applying public accommodation laws to "excise certain ideas or viewpoints from the public dialogue" is "more than enough … to represent an impermissible abridgement of the First Amendment's right to speak freely" (cleaned up)); *Rosenberger v. University of Virginia*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

126.    Indeed, H.B. 25-1312 was passed for the very purpose of suppressing traditional views on sex and gender and punishing those who refuse to address transgender-identifying individuals using so-called chosen names and preferred pronouns.

127.    Even if H.B. 25-1312 were merely *content*-based, *see Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) (a regulation is content-based when it is "'based upon either the content or the subject matter of the speech'"), it would still be subject to strict scrutiny, *Reed v. Gilbert*, 576 U.S. 155, 163-64 (2015). And Colorado plainly fails that test. *See Kennedy v. Bremerton School District*, 597 U.S. 507, 524 (2022) (the burden is on the government to show a compelling interest and narrow tailoring). While the State may have an interest in ensuring equal *access* to places of public accommodation, it has no compelling interest in suppressing *speech* on issues of significant public concern like sex and gender. *See 303 Creative*, 600 U.S. at 590-92 (observing that public accommodations laws "sweep too broadly when deployed to compel speech"). Even if it did, H.B 25-1312 is not sufficiently tailored to further that interest. It is therefore unconstitutional.

128.    ***Overbreadth***. The First Amendment prohibits overbroad laws: regulations of speech that "punish a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up). This "expansive remedy" guards against the possibility that "an overbroad law may deter or 'chill' constitutionally protected speech." *Id.* at 119 The freedoms protected by First Amendment, in other words, "'need breathing space to survive,'" so the government may regulate speech "'only with narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A policy

is overbroad "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

129.   The "gender expression" and "chosen name" provisions are facially overbroad. By their terms, they apply to protected speech. The law's unconstitutional applications make up a significant number of its applications and their ban on deadnaming and misgendering are the "heartland applicatio[n]." *Moody v. NetChoice*, 603 U.S. 707, 744 (2024).

130.   ***As Applied.*** The "chosen name" and "gender expression" definitions are also unconstitutional as applied to Plaintiffs and their members. Plaintiffs and their members operate in places of public accommodations. They want to refer to transgender-identifying individuals using biological pronouns, birth names, and other forms of address inconsistent with an individual's self-professed gender identity or gender expression. But the "chosen name" and "gender expression" provisions make their speech unlawful and unconstitutionally compel them to alter their speech.

131.   Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

## COUNT II
### Violation of the First Amendment
### (Colo. Rev. Stat. §24-34-601(2)(a) – The "Unwelcome" Provision)

132.   Plaintiffs repeat and reallege each of the prior allegations in this complaint.

133.   The Colorado Anti-Discrimination Act's Unwelcome Provision violates the First Amendment to the United States Constitution, both facially and as applied.

134.   The Unwelcome Provision makes it "a discriminatory practice and unlawful for a person, directly or indirectly, to … publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of" a protected characteristic. Colo. Rev. Stat. §24-34-601(2)(a).

135.   The Unwelcome Provision always targets speech. It prohibits, among other things, "publish[ing]," "display[ing]," or "post[ing]" certain "communication[s]." *Id.*

136.   The Unwelcome Provision clearly prohibits speech based on content and viewpoint. It prohibits all speech that makes someone feel "unwelcome, objectionable, unacceptable, or undesirable." But "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243. It also compels speech by, for example, requiring published speech to be "[w]elcom[ing]" and "[un]objectionable." Even assuming this provision only regulated speech based on content, Defendants have no compelling interest for prohibiting this type of speech.

137.   The Unwelcome Provision is also overbroad. Countless forms of protected speech are prohibited by the Unwelcome Provision. Consider a retail business owner who posts a sign in his store saying, "Transgenderism Is A Mental Illness!" That is surely protected speech—it advances a view on whether an individual's non-biological gender identity should be affirmed or corrected—but it just as surely could make a transgender individual feel "unwelcome" in the store based on their gender identity. Or consider a Christian-owned bookstore with a banner in its religious books section stating, "The Bible is the only true

word of God." Again, that is protected speech, but it might make a Muslim imam feel that his presence is "undesirable" because of his religious creed. Or consider a Palestinian-born doctor who posts on social media that "Israel is an apartheid state!" That post expresses a view about a salient political issue, but a Jewish patient who reads the post might feel "unwelcome" in the doctor's practice.

138.  The Unwelcome Provision is not a mere "incidental" regulation of speech. *Telescope Media*, 936 F.3d at 757. In other words, the Provision does not simply prohibit statements indicating that an individual will actually be denied service or access because of a protected characteristic. *Id.* In fact, *another* provision already does that. *See* Colo. Rev. Stat. §24-34-601(2)(a) (separately prohibiting statements "indicat[ing] that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual"). The Unwelcome Provision goes beyond such incidental regulation and directly targets speech that has nothing to do with actual access. *See 303 Creative*, 600 U.S. at 587-92 (public accommodation laws may ensure equal access, but they may not target pure speech).

139.  The Unwelcome Provision is also unconstitutional as applied to Plaintiffs and their members. The Unwelcome Provision prevents them from publishing materials or sending communications that refer to transgender-identifying individuals using biological pronouns, birth names, or other forms of address inconsistent with an individual's self-professed gender identity or gender expression, or that express opposition to the use of so-called

gender-affirming language. Like the "chosen name" and "gender expression" definitions, the Unwelcome Provision compels speech and discriminates based on content and viewpoint.

140. Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

## COUNT III
### Violation of the Fourteenth Amendment
### (Colo. Rev. Stat. §24-34-301(3.5) & (9) – The "Chosen Name" and "Gender Expression" Provisions)

141. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

142. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness doctrine "addresses two concerns." *United States v. Lesh*, 107 F.4th 1239, 1247 (10th Cir. 2024). First, it ensures that regulated parties "'know what is required of them so they may act accordingly.'" *Id.* Second, it ensures that "'those enforcing the law do not act in an arbitrary or discriminatory way.'" *Id.*; *see Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1311 (8th Cir. 1997) ("a central purpose of the vagueness doctrine" is to prevent "'arbitrary and discriminatory enforcement'").

143. As to the first concern, a law is impermissibly vague if it "'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *Lesh*, 107 F.4th at 1247. And for the second concern, a law is impermissibly vague if "it lacks the necessary precision and guidance so that those enforcing the law do not act in an arbitrary

or discriminatory way." *Id.* (cleaned up). "[L]aws must provide explicit standards for those who apply them." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023) (quoting *Grayned*, 408 U.S. at 108).

144. The need for clarity is especially critical when First Amendment freedoms are at stake—as they are here. If a challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Virginia*, 359 U.S. 344, 353 (1959).

145. H.B. 25-1312's definitions of "chosen name" and "gender expression" are impermissibly vague both on their face and as applied.

146. H.B. 25-1312 redefines "gender expression" to include the use of a "chosen name, and how the individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). But the State has not explained what forms of "addres[s]" it will require Coloradans to honor. Likewise, the bill defines a "chosen name" to mean any "name that an individual requests to be known as … *so long as* the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." *Id.* §24-34-301(3.5) (emphasis added). But it offers no detail on what "language" the State considers "offensive" or what "purposes" it considers "frivolous."

147. Coloradans who operate in public accommodations are left to guess as to how Defendants will choose to enforce these terms. This vagueness guarantees arbitrary

enforcement and will "inevitably lead [Coloradans] to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up).

148.   Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

## COUNT IV
### Violation of the Fourteenth Amendment
### (Colo. Rev. Stat. §24-34-601(2)(a) – The "Unwelcome" Provision)

149.   Plaintiffs repeat and reallege each of the prior allegations in this complaint.

150.   Like the "chosen name" and "gender expression" definitions, the Anti-Discrimination Act's Unwelcome Provision is unconstitutionally vague both on its face and as applied.

151.   The Unwelcome Provision makes it unlawful to "directly or indirectly … publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable." Colo. Rev. Stat. §24-34-601(2)(a).

152.   But the Provision leaves many of its terms undefined. It fails to offer any detail on what kind of statements Colorado will consider to be "unwelcome," "objectionable," "unacceptable," or "undesirable." It also fails to explain what kinds of "indirect" publication

or communication Colorado will punish. Because these key terms lack any meaningful boundary, the Unwelcome Provision again invites arbitrary enforcement.

153. Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendants and provide the following relief:

A. A declaratory judgment that Section 8 of Colorado House Bill 25-1312, codified at Colo. Rev. Stat. §24-34-301(3.5) & (9), violates the First and Fourteenth Amendments on its face and as applied;

B. A preliminary and permanent injunction barring Defendants from enforcing Section 8 of Colorado House Bill 25-1312, codified at Colo. Rev. Stat. §24-34-301(3.5) & (9), in full and as applied;

C. A declaratory judgment that the Colorado Anti-Discrimination Act's Unwelcome Provision, codified at Colo. Rev. Stat. §24-34-601(2)(a), violates the First and Fourteenth Amendments on its face and as applied;

D. A preliminary and permanent injunction barring Defendants from enforcing the Colorado Anti-Discrimination Act's Unwelcome Provision, codified at Colo. Rev. Stat. §24-34-601(2)(a), in full and as applied;

E. Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F. All other relief that the Court deems just and proper.

Dated: May 19, 2025

Respectfully submitted,

*/s/ J. Michael Connolly*

J. Michael Connolly
Cameron T. Norris
Paul R. Draper *
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*\* Application for admission pending*

*Counsel for Plaintiffs*

# Exhibit A



HOUSE BILL 25-1312

BY REPRESENTATIVE(S) Garcia and Stewart R., Bacon, Boesenecker, Brown, Camacho, Duran, Espenoza, Froelich, Gilchrist, Hamrick, Joseph, Lieder, Lindsay, Mabrey, McCormick, Rydin, Sirota, Smith, Story, Titone, Valdez, Velasco, Willford, Zokaie, McCluskie, Clifford, Lindstedt, Paschal, Woodrow;
also SENATOR(S) Winter F. and Kolker, Amabile, Ball, Bridges, Cutter, Danielson, Gonzales J., Hinrichsen, Kipp, Marchman, Michaelson Jenet, Wallace, Weissman, Coleman.

CONCERNING LEGAL PROTECTIONS FOR TRANSGENDER INDIVIDUALS.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1. Short title.** The short title of this act is the "Kelly Loving Act".

**SECTION 2.** In Colorado Revised Statutes, 14-2-106, **add** (3) as follows:

**14-2-106. License to marry.** (3) (a) IF, AT ANY POINT FOLLOWING THE ISSUANCE OF A VALID LICENSE TO MARRY ISSUED PURSUANT TO THIS SECTION, A PARTY TO THE MARRIAGE PRESENTS THE ISSUING COUNTY CLERK

*Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.*

AND RECORDER WITH APPROPRIATE DOCUMENTATION OF THAT PARTY'S NAME CHANGE AND REQUESTS THE ISSUANCE OF A NEW LICENSE TO MARRY, THE COUNTY CLERK SHALL ISSUE A NEW LICENSE TO MARRY THAT REFLECTS THE PARTY'S NAME CHANGE.

(b) A NEW LICENSE TO MARRY ISSUED PURSUANT TO SUBSECTION (3)(a) OF THIS SECTION SUPERSEDES THE ORIGINAL LICENSE TO MARRY AS THE OFFICIAL PUBLIC RECORD AND MUST NOT BE MARKED AS AMENDED OR INDICATE IN ANY MANNER THAT THE NAME ON THE LICENSE TO MARRY HAS BEEN CHANGED.

**SECTION 3.** In Colorado Revised Statutes, **amend** 14-2-107 as follows:

**14-2-107. When licenses to marry issued - validity.** Licenses to marry shall MUST be issued by the county clerk and recorder only during the hours that the office of the county clerk and recorder is open as prescribed by law and at no other time, and such licenses shall MUST show the exact date and hour of their issue. NEW LICENSES TO MARRY ISSUED PURSUANT TO SECTION 14-2-106 (3)(a) MUST SHOW THE DATE AND HOUR OF ISSUANCE OF THE NEW LICENSE, BUT THE EFFECTIVE DATE OF THE MARRIAGE IS THE DATE LISTED ON THE ORIGINAL LICENSE TO MARRY. NEW LICENSES TO MARRY ISSUED PURSUANT TO SECTION 14-2-106 (3)(a) ARE VALID. A license shall not be valid for use outside the state of Colorado. Within the state, such licenses shall not be valid for more than thirty-five days after the date of issue. If any license to marry is not used within thirty-five days, it is void and shall be returned to the county clerk and recorder for cancellation.

**SECTION 4.** In Colorado Revised Statutes, 14-15-110, **add** (3) as follows:

**14-15-110. Issuance of a civil union license - certification - fee.** (3) (a) IF, AT ANY POINT FOLLOWING THE ISSUANCE OF A VALID CIVIL UNION LICENSE ISSUED PURSUANT TO THIS SECTION, A PARTY TO THE CIVIL UNION PRESENTS THE ISSUING COUNTY CLERK AND RECORDER WITH APPROPRIATE DOCUMENTATION OF THAT PARTY'S NAME CHANGE AND REQUESTS THE ISSUANCE OF A NEW CIVIL UNION LICENSE, THE COUNTY CLERK SHALL ISSUE A NEW CIVIL UNION LICENSE THAT REFLECTS THE PARTY'S NAME CHANGE.

(b) A NEW CIVIL UNION LICENSE ISSUED PURSUANT TO SUBSECTION

(3)(a) OF THIS SECTION SUPERSEDES THE ORIGINAL CIVIL UNION LICENSE AS THE OFFICIAL PUBLIC RECORD AND MUST NOT BE MARKED AS AMENDED OR INDICATE IN ANY MANNER THAT THE NAME ON THE CIVIL UNION LICENSE HAS BEEN CHANGED.

**SECTION 5.** In Colorado Revised Statutes, **amend** 14-15-111 as follows:

**14-15-111. When civil union licenses issued - validity.** The county clerk and recorder shall issue a civil union license only during the hours that the office of the county clerk and recorder is open as prescribed by law and at no other time and shall show the exact date and hour of the license's issue. NEW CIVIL UNION LICENSES ISSUED PURSUANT TO SECTION 14-2-110 (3)(a) MUST SHOW THE DATE AND HOUR OF ISSUANCE OF THE NEW LICENSE, BUT THE EFFECTIVE DATE OF THE CIVIL UNION IS THE DATE LISTED ON THE ORIGINAL CIVIL UNION LICENSE. NEW CIVIL UNION LICENSES ISSUED PURSUANT TO SECTION 14-2-110 (3)(a) ARE VALID. A civil union license is not valid for use outside the state of Colorado. Within the state, a civil union license is not valid for more than thirty-five days after the date of issue. If a civil union license is not used within thirty-five days, it is void, and one of the parties shall return the civil union license to the county clerk and recorder that issued the license for cancellation.

**SECTION 6.** In Colorado Revised Statutes, **add** 22-1-145.5 as follows:

**22-1-145.5. Policies related to chosen names - definition.** (1) AS USED IN THIS SECTION, "LOCAL EDUCATION PROVIDER" MEANS A SCHOOL DISTRICT, A CHARTER SCHOOL AUTHORIZED BY A SCHOOL DISTRICT PURSUANT TO PART 1 OF ARTICLE 30.5 OF THIS TITLE 22, A CHARTER SCHOOL AUTHORIZED BY THE STATE CHARTER SCHOOL INSTITUTE PURSUANT TO PART 5 OF ARTICLE 30.5 OF THIS TITLE 22, OR A BOARD OF COOPERATIVE SERVICES CREATED AND OPERATING PURSUANT TO ARTICLE 5 OF THIS TITLE 22 THAT OPERATES ONE OR MORE PUBLIC SCHOOLS, OR A FACILITY SCHOOL APPROVED PURSUANT TO SECTION 22-2-407.

(2) IF A LOCAL EDUCATION PROVIDER OR ITS EMPLOYEES, AN EDUCATOR, OR A CONTRACTOR, AS DEFINED IN SECTION 22-1-143, CHOOSES TO ENACT OR ENFORCE A POLICY RELATED TO NAMES, THAT POLICY MUST BE INCLUSIVE OF ALL REASONS THAT A STUDENT MIGHT ADOPT A NAME THAT

DIFFERS FROM THE STUDENT'S LEGAL NAME.

**SECTION 7.** In Colorado Revised Statutes, 22-32-109.1, **amend** (2)(a)(I) introductory portion and (2)(a)(I)(J) as follows:

**22-32-109.1. Board of education - specific powers and duties - safe school plan - conduct and discipline code - safe school reporting requirements - school response framework - school resource officers - definitions.** (2) **Safe school plan.** To provide a learning environment that is safe, conducive to the learning process, and free from unnecessary disruption, each school district board of education or institute charter school board for a charter school authorized by the charter school institute shall, following consultation with the school district accountability committee and school accountability committees, parents, teachers, administrators, students, student councils where available, and, where appropriate, the community at large, adopt and implement a safe school plan, or review and revise, as necessary in response to any relevant data collected by the school district, any existing plans or policies already in effect. In addition to the aforementioned parties, each school district board of education, in adopting and implementing its safe school plan, may consult with victims' advocacy organizations, school psychologists, local law enforcement, and community partners. The plan, at a minimum, must include the following:

(a) **Conduct and discipline code.** (I) A concisely written conduct and discipline code that must be enforced uniformly, fairly, and consistently for all students. Copies of the code ~~shall~~ MUST be provided to each student upon enrollment at the preschool, elementary, middle, and high school levels and be posted or kept on file at each public school in the school district. The school district shall take reasonable measures to ensure that each student of each public school in the school district is familiar with the code. The code must include, but need not be limited to:

(J) A dress code policy that prohibits students from wearing apparel that is deemed disruptive to the classroom environment or to the maintenance of a safe and orderly school. The dress code policy may require students to wear a school uniform or may establish minimum standards of dress. THE DRESS CODE POLICY MUST ALLOW EACH STUDENT TO CHOOSE FROM ANY OF THE OPTIONS PROVIDED IN THE DRESS CODE POLICY.

**SECTION 8.** In Colorado Revised Statutes, 24-34-301, **amend** (9);

and **add** (3.5) as follows:

**24-34-301. Definitions.** As used in parts 3 to 10 of this article 34, unless the context otherwise requires:

(3.5) "CHOSEN NAME" MEANS A NAME THAT AN INDIVIDUAL REQUESTS TO BE KNOWN AS IN CONNECTION TO THE INDIVIDUAL'S DISABILITY, RACE, CREED, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER EXPRESSION, MARITAL STATUS, FAMILIAL STATUS, NATIONAL ORIGIN, OR ANCESTRY, SO LONG AS THE NAME DOES NOT CONTAIN OFFENSIVE LANGUAGE AND THE INDIVIDUAL IS NOT REQUESTING THE NAME FOR FRIVOLOUS PURPOSES.

(9) "Gender expression" means an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior, CHOSEN NAME, AND HOW THE INDIVIDUAL CHOOSES TO BE ADDRESSED.

**SECTION 9.** In Colorado Revised Statutes, **add** 24-34-300.5 and 24-34-300.7 as follows:

**24-34-300.5. Short title.** THE SHORT TITLE OF PARTS 3 TO 8 OF THIS ARTICLE 34 IS THE "COLORADO ANTI-DISCRIMINATION ACT" OR "CADA".

**24-34-300.7. Legislative declaration.** (1) THE GENERAL ASSEMBLY FINDS AND DECLARES THAT EACH COLORADAN HAS THE RIGHT TO ACCESS FAIR EMPLOYMENT, HOUSING OPPORTUNITIES, PUBLIC ACCOMMODATIONS, AND ADVERTISING THAT IS FREE FROM DISCRIMINATION REGARDLESS OF THEIR MEMBERSHIP IN A PROTECTED CLASS, AS THOSE CLASSES ARE LISTED IN SECTIONS 24-34-402, 24-34-502, 24-34-601, AND 24-34-701. CADA PROHIBITS DISCRIMINATION BASED ON THESE PROTECTED CLASSES AND ENSURES THAT EVERY COLORADAN IS ABLE TO ENJOY FREEDOM FROM DISCRIMINATION.

(2) THE GENERAL ASSEMBLY FURTHER FINDS AND DECLARES THAT COLORADO HAS A LONG HISTORY OF SUPPORTING FREEDOM OF CHOICE FOR COLORADANS. THIS INCLUDES THE CHOICE TO MAKE DECISIONS RELATED TO SAFELY SEEKING HEALTH-CARE SERVICES, INCLUDING LEGALLY PROTECTED HEALTH-CARE ACTIVITIES, AS DEFINED IN SECTION 12-30-121 (1)(d), THAT SUPPORT MENTAL, PHYSICAL, AND EMOTIONAL WELL-BEING FOR

COLORADANS, THEIR CHILDREN, AND THEIR FAMILY MEMBERS. IT IS THE PUBLIC POLICY OF COLORADO TO ENSURE THESE IMPORTANT DECISIONS CAN BE MADE WITHOUT UNNECESSARY GOVERNMENTAL INTERFERENCE.

**SECTION 10.** In Colorado Revised Statutes, 25-2-113.8, **repeal** (5) as follows:

**25-2-113.8. Birth certificate modernization act - new birth certificate following a change in gender designation - short title - definition.** (5) ~~The state registrar may only amend a gender designation for an individual's birth certificate one time upon the individual's request. Any further requests from the individual for additional gender designation changes require the submission of a court order indicating that the gender designation change is required.~~

**SECTION 11.** In Colorado Revised Statutes, 42-2-107, **amend** (2)(a)(III) as follows:

**42-2-107. Application for license or instruction permit - anatomical gifts - donations to Emily Keyes - John W. Buckner organ and tissue donation awareness fund - legislative declaration - rules - annual report - repeal.** (2) (a) (III) The department may only amend a sex designation for an individual's driver's license ~~one time~~ THREE TIMES upon the individual's request. Any further requests from the individual for additional sex designation changes require the submission of a court order indicating that the sex designation change is required.

**SECTION 12.** In Colorado Revised Statutes, 42-2-302, **amend** (2.5)(b) as follows:

**42-2-302. Department may or shall issue - limitations - rules.** (2.5) (b) The department may only amend a sex designation for an individual's identification card ~~one time~~ THREE TIMES upon the individual's request. Any further requests from the individual for additional sex designation changes require the submission of a court order indicating that the sex designation change is required.

**SECTION 13.** In Colorado Revised Statutes, 42-2-505, **amend** (1.5)(b) as follows:

**42-2-505. Identification documents - individuals not lawfully present - rules.** (1.5) (b) The department may only amend a sex designation for an individual's identification document ~~one time~~ THREE TIMES upon the individual's request. Any further requests from the individual for additional sex designation changes require the submission of a court order indicating that the sex designation change is required.

**SECTION 14. Severability.** If any provision of this act or the application of this act to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

**SECTION 15. Effective date.** This act takes effect upon passage; except that sections 11, 12, and 13 of this act take effect October 1, 2026.

**SECTION 16. Safety clause.** The general assembly finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, or safety or for appropriations for

the support and maintenance of the departments of the state and state institutions.

Julie McCluskie
SPEAKER OF THE HOUSE
OF REPRESENTATIVES

James Rashad Coleman, Sr.
PRESIDENT OF
THE SENATE

Vanessa Reilly
CHIEF CLERK OF THE HOUSE
OF REPRESENTATIVES

Esther van Mourik
SECRETARY OF
THE SENATE

APPROVED Friday May 16ᵗʰ 2025 at 11:12 AM
(Date and Time)

Jared S. Polis
GOVERNOR OF THE STATE OF COLORADO